IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00317-PAB-MJW

BOXER F2, L.P., a Texas limited partnership,

      Plaintiff,

v.

FLAMINGO WEST, LTD., d/b/a Legalwiz Publications,
BRONCHICK & ASSOCIATES,
WILLIAM BRONCHICK, and
BRONCHICK & ASSOCIATES, P.C.,

      Defendants.

_____

**ORDER**
_____

The Court presided over a 3-day bench trial in this case, involving the alleged breach of a lease agreement between Boxer F2, L.P. ("Boxer"), the owner of commercial space, and Flamingo West, Ltd. ("Flamingo West"), a business owned by William Bronchick ("Mr. Bronchick"). This Court has subject-matter jurisdiction based on 28 U.S.C. § 1332(a).

Plaintiff brings four claims against defendants. Plaintiff's first claim, against Flamingo West, Bronchick & Associates, and Mr. Bronchick, is for breach of the lease agreement. Docket No. 65 at 10. Plaintiff's second claim for relief, also for breach of the lease agreement, is against Bronchick & Associates, P.C. ("Bronchick PC") as the alleged successor entity of Bronchick & Associates. *Id*. at 13. Plaintiff's third claim is against Bronchick PC for quantum meruit based on Bronchick PC's occupation of a portion of the leased premises. *Id*. at 14. Plaintiff's fourth claim is against Flamingo

West and Mr. Bronchick for fraudulent transfers pursuant to the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), Colo. Rev. Stat. § 38-8-101, *et seq. Id*. at 15. Defendants Flamingo West and Bronchick PC assert the affirmative defenses of constructive eviction and failure to mitigate damages. *See* Docket No. 66 at 11-12, ¶¶ 88-89, 92; Docket No. 148 at 4-5.

On October 23, 2015, the Court granted summary judgment in the amount of $2,428,625.03 to plaintiff on its breach of lease claim against Flamingo West. Docket No. 191. Flamingo West, by not responding to plaintiff's summary judgment motion, did not contest any of the facts the plaintiff used to support its motion and to calculate damages. The damages figure in plaintiff's summary judgment motion was supported by the calculations, charts, and discussion provided in a March 20, 2015 report by Mr. Robert Aucone, an accountant certified in forensic accounting. Exhibit 137, pp. 4-16.[1]

Plaintiff called three witnesses at the trial: Mr. Bronchick, Mr. Aucone, and Mr. Zachary Segal, an asset manager for Boxer Property Management Corporation, which was retained by Boxer as the leasing agent and property manager for the Pavilion Towers – the property in which the premises leased by Flamingo West was located. Defendant called one witness: Mr. Bronchick.

---

[1]Unless otherwise indicated, all citations to "Exhibit" refer to trial exhibits. Numerical exhibits are plaintiff's exhibits; alphabetical exhibits are defendants' exhibits.

## I.  FINDINGS OF FACT

There are three sources of facts from which the Court determines whether plaintiff sustained its burden of proof on its claims: facts to which the parties have stipulated, facts established as a result of a sanctions order, and facts found at trial.

### A.  <u>Stipulated Facts</u>

The parties stipulated to the following facts:

1.  Plaintiff Boxer is a Texas limited partnership.  Flamingo West is a Colorado corporation.  Bronchick PC is a Colorado corporation.[2]  Docket No. 192 at 1, ¶¶ 1-3.

2.  On or about April 14, 2003, Flamingo West, dba Legalwiz Publications and Bronchick & Associates, executed a lease for premises located in the Pavilion Tower Building at 2821 South Parker Road, Suite 405, Aurora, Colorado 80014 (the "Initial Premises").  The landlord in the 2003 Lease was RMC/Pavilion Towers, LLC.  Docket No. 192 at 1-2, ¶¶ 4-7.

3.  On or about December 5, 2006, the First Amendment to the 2003 Lease was signed by RMC/Pavilion Towers, LLC and "Flamingo West dba Legalwiz Publications and Bronchick & Associates."  *Id*. at 2, ¶ 8.

4.  On or about March 7, 2010, the same parties executed the Second Amendment to the 2003 Lease.  *Id*., ¶ 9.

---

[2]Bronchick PC is Mr. Bronchick's law firm.  Mr. Bronchick testified that Bronchick & Associates was a trade name of Flamingo West.  However, the magistrate judge's May 4, 2015 sanctions order establishes that Bronchick & Associates was operating as a sole proprietorship or unincorporated partnership on April 14, 2003, the date the Lease Agreement was executed.  Docket No. 130 at 9; *see* Docket No. 65 at 13, ¶ 62a.

5.   On or about March 29, 2011, the same parties executed the Third Amendment to the 2003 Lease.  Flamingo West signed as "Flamingo West Limited Corp."  Pursuant to the Third Amendment, the premises leased was Suite 505 (the "Leased Premises") instead of the Initial Premises.  *Id.*, ¶ 10-11.

6.   On or about June 2, 2011, Boxer acquired the Pavilion Tower Building.  *Id.*, ¶ 12.

7.   On or about August 1, 2011, Boxer and Flamingo West entered into and executed the Fourth Amendment to the 2003 Lease.  Flamingo West signed as "Flamingo West Limited Corp."  Pursuant to the Fourth Amendment, Boxer became Flamingo West's landlord.  The term of the lease agreement under the Fourth Amendment expired on October 1, 2016.  The Fourth Amendment specifies that from October 1, 2011 through September 30, 2016 the monthly rent due under the Lease Agreement is $10,546.00.  *Id.* at 2-3, ¶¶ 13-17.

8.   Bronchick PC occupied a portion of the Leased Premises from June 2003 through November 1, 2012.  *Id.* at 3, ¶ 18.

9.   Flamingo West made late and partial monthly rent payments from April 2012 through August 2012.  *Id.*, ¶ 19.

10.   The last payment that Flamingo West or any other occupant of the Leased Premises made to plaintiff was a payment of $11,546.00 on August 30, 2012.  *Id.*, ¶ 20.

11.   On or shortly before November 2, 2012, Flamingo West and the other occupants of the Leased Premises vacated the Leased Premises without plaintiff's consent.  *Id.*, ¶¶ 22-23.

12.   Flamingo West breached the Lease Agreement by failing to make required monthly rent payments under the Lease Agreement and by abandoning the Leased Premises.  *Id*. at 4, ¶ 24.

13.   "Bronchick & Associates" was never registered with the Colorado Secretary of State as a d/b/a or trade name of Flamingo West.  *Id*., ¶ 26.

14. Section 11.1 of the Lease Agreement provides, in pertinent part, that:

The following shall be deemed to be events of default by Tenant under this Lease: (1) Tenant shall fail to pay when due any installment of Rent or any other payment required pursuant to this Lease; (2) Tenant shall abandon any substantial portion of the Leased Premises . . .

*Id*., ¶ 27.

15.   Under Section 2.5 of the Lease Agreement:

if any regular monthly installment of Rent is not received by Landlord on or before the fifth (5th) day of the month for which such Rent is due, a late payment charge of ten percent (10%) of such past-due amount shall become due and payable in addition to any other amounts due and payable.

*Id*., ¶ 28.

16. Pursuant to Section 2.5 of the Lease Agreement, past-due rent and other past-due amounts owed under the Lease Agreement bear an interest rate of 18% per annum.  *Id*. at 5, ¶ 30.

17.   Under Section 11.2 of the Lease Agreement, if the tenant is in default under the Lease Agreement, the landlord is entitled to recover damages from the tenant, which include, without limitation, the following: 1) the costs of repairs and alterations made to the Leased Premises in connection with re-leasing the premises; 2) an amount equal to the rent and any associated late fees owed by the tenant for the remainder of

the term of the Lease Agreement less any rent payments received by the landlord from any new tenant occupying the Leased Premises; and 3) all reasonable attorneys' fees and costs incurred by landlord in connection with the tenant's breach of the lease agreement. *Id*. at 4-5, ¶ 29.

    **B.** <u>**May 4, 2015 Sanctions Order**</u>

    18.   After a protracted discovery dispute, the assigned magistrate judge, in a February 2015 order, concluded that "Defendants – all Defendants – have conducted themselves in bad faith and have intentionally failed to honor their discovery obligations under the Federal Rules of Civil Procedure."   Docket No. 86 at 11.   He also found that defendants acted in "flagrant disregard" of the magistrate judge's order compelling discovery and "offer[ed] only frivolous arguments in defense of their failure to provide discovery."  *Id*. at 12.   The magistrate judge rejected plaintiff's proposed sanction – striking defendants' answer to the amended complaint – as excessive.  *Id*.  Applying the factors established in *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920-22 (10th Cir. 1992), the magistrate judge concluded that the appropriate sanction was for the Court to draw adverse inferences, taken as established facts under Fed. R. Civ. P. 37(b)(2)(A)(i).  *Id*. at 12-13.   However, the magistrate judge gave defendants a last chance to comply with their discovery obligations before the sanction was imposed.  *Id*. at 13-14.

    19.   On March 2, 2015, plaintiff filed a renewed motion for sanctions.  Docket No. 89.   On April 29, 2015, the magistrate judge held a hearing on plaintiff's renewed motion.  *See* Docket No. 123.   On May 4, 2015, the magistrate judge granted plaintiff's renewed motion for sanctions and, as a sanction for defendants' discovery violations,

ordered that certain paragraphs of plaintiff's second amended complaint be established as facts for purposes of trial.  Docket No. 130 at 9.  On October 16, 2015, the Court overruled defendants' objections to the May 4, 2015 sanctions order.  Docket No. 185 at 15.  Thus, pursuant to the magistrate judge's sanctions order, the following facts are established:

a.  Mr. Bronchick is the sole owner, operator, officer, and shareholder of Flamingo West.  Mr. Bronchick is the only person who operates the business of Flamingo West, and he has sole decision-making authority for Flamingo West. *See* Docket No. 65 at 11, ¶ 55a-c.

b.  Mr. Bronchick did not maintain enough money in Flamingo West's bank account(s) to cover the costs of Flamingo West's financial obligations under the Lease Agreement.  *See id*., ¶ 55d.

c.  Mr. Bronchick received "distributions" or payments from Flamingo West even when Flamingo West was unable to meet its outstanding financial obligations.  *See id*., ¶ 55e.

d.  Adequate corporate records for Flamingo West were not maintained. *See id*. at 12, ¶ 55f.

e.  Flamingo West is not operated as a separate and distinct business entity.  At one time, Flamingo West operated under the name "Bronchick & Associates."  *See id*., ¶ 55g.

f.  Flamingo West used the marks "Legalwiz" and "Legalwiz Publications" in connection with its business.  "Legalwiz" and "Legalwiz Publications" are also

used in connection with another business owned by Mr. Bronchick: Bronchick Consulting Group, LLC.  *See id*., ¶ 55g.

g.  In or about April 2012, Flamingo West became insolvent or otherwise unable to pay liabilities as they came due.  *See id*. at 15, ¶ 74.

h.  Flamingo West's intent to hinder, delay, or defraud creditors is evidenced by, *inter alia*, the following: 1) transfers of Flamingo West's assets were made to Mr. Bronchick, a shareholder of Flamingo West; 2) Mr. Bronchick retained possession or control of the assets transferred; and 3) Flamingo West owes a substantial debt to Boxer.  *See id*. at 16, ¶ 83.

i.  Flamingo West made fraudulent transfers to at least Mr. Bronchick. Flamingo West made said transfers with actual intent to hinder, delay, or defraud its creditors, including Boxer.  *See id*., ¶¶ 79-80.

j.  Flamingo West did not receive a reasonably equivalent value in exchange for the transfers it made.  The assets of Flamingo West that remained after the transfers were made were and are insufficient for Flamingo West to pay its outstanding liabilities.  *See id*., ¶ 81-82.

k.  Bronchick & Associates was operating as a sole proprietorship or unincorporated partnership on April 14, 2003, the date the Lease Agreement was executed.  Bronchick PC was formed as a Colorado professional corporation on or about June 10, 2003.  At some time after the formation of Bronchick PC, Bronchick PC acquired the assets of Bronchick & Associates and,

expressly or impliedly, assumed the liabilities of Bronchick & Associates.  *See id*. at 13, ¶ 62a-c.

l.  Bronchick PC's acquisition of the assets and liabilities of Bronchick & Associates resulted in a merger or consolidation of the two entities, and Bronchick PC is a mere continuation of Bronchick & Associates.  *See id*. at 14, ¶ 62d-e.

m.  The address of the registered agent for Bronchick PC is the address of the Initial Premises.  *See id*., ¶ 62g.

n.  In November 2011, Bronchick PC filed a Statement of Change with the Colorado Secretary of State, changing its registered agent address to the address of the Leased Premises.  *See id*., ¶ 62h.

o.  Bronchick PC openly operated out of the Leased Premises.  *See id*., ¶ 62f.

**C.  Findings of Fact from Trial Evidence**

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact:

### *1.  The Lease Agreement*

20.  Mr. Bronchick was present when the original 2003 Lease Agreement was signed.  Mr. Bronchick testified that he signed the lease agreement as president of Flamingo West and that there was only one tenant, Flamingo West.  Mr. Bronchick said that neither Bronchick & Associates nor Legalwiz was ever a party to the lease agreement, and that he did not personally guarantee the lease.  The Court finds Mr.

Bronchick credible as to this testimony.  Mr. Segal admitted that he does not recall asking Mr. Bronchick to sign a personal guarantee.

21.  There are two "Base Rent" provisions in the 2003 lease:

a. The first Base Rent provision, Section 1.7, states in relevant part:

Tenant shall pay, in accordance with the terms and provisions of Section 2.2 of this Lease, Base Rent for the lease and use of the Leased Premises at the annual rental rate per rentable square foot of space in the Leased Premises for the specific time periods set forth below. . . .

Exhibit 1, p. 2.  The lease then provides the applicable monthly rent, the rental rate per square foot, and the applicable time period of each rate.

b. The second Base Rent provision, Section 2.2, states in relevant part:

Tenant agrees to pay monthly the Base Rent set forth in Section 1.7 of this Lease. . . . One (1) monthly installment of Base Rent shall be due and payable on the date of execution of this Lease by Tenant for the first (1st) month's Base Rent and a like monthly installment shall be due and payable on or before the first (1st) day of each calendar month . . . and all succeeding installments of Base Rent shall be payable on or before the first (1st) day of each succeeding calendar month during the Lease Term.

*Id.* at 3.

22.  The 2003 Lease's Additional Rent provision, Section 2.4, states:

Tenant agrees to pay all rent and other sums of money (whether specified in this Article 2, pursuant to indemnity or reimbursement obligations or otherwise) as shall become due from and payable by Tenant to Landlord under this Lease (collectively, the "Rent") at the times and in the manner provided in this Lease, without abatement, notice, demand, offset, reduction or counterclaim (except as otherwise provided in this Lease). All Rent in addition to Base Rent shall constitute additional rental under this Lease and Landlord shall be entitled to exercise the same rights and remedies provided for in this Lease for the nonpayment of any Rent.

*Id.* at 5.

23. The 2003 Lease's Late Payment Charge provision, Section 2.5, states:

Other remedies for nonpayment of Rent notwithstanding, if any regular monthly installment of Rent is not received by Landlord on or before the fifth (5th) day of the month for which such Rent is due, a late payment charge of ten percent (10%) of such past due amount shall become due and payable in addition to any other amounts due and payable. In addition, all Rent owed by Tenant to Landlord under this Lease shall bear interest from the date due until the date received at a rate (the "Interest Rate") equal to the lesser of the highest rate allowable under applicable law or eighteen percent (18%) per annum.

*Id*.

24.   Mr. Segal testified that he was not present during the negotiation of the lease agreement with Flamingo West.  Thus, the Court finds that he has no personal knowledge of the discussions between Boxer and Mr. Bronchick, as Flamingo West's representative, or how those parties understood the terms of the lease agreement.

25.   Boxer's lease ledger reflects Flamingo West owing plaintiff $518,290.45 for charges and payments regarding Suite 505. Exhibit 29, p. 2.  Boxer's lease ledger shows assessments of late fees to Flamingo West between June 2011 and December 2012, which are calculated as 10% on the entire balance past due.  *Id*. at 1-2.  The lease ledger does not reflect the assessment of late fees or penalties between December 2012 and September 2016.  *See* Exhibit 29.

26.   Boxer took steps to secure new tenants and mitigate its damages due to Flamingo West's abandonment of the Leased Premises.  Boxer was not able to lease the space to a single tenant.  Boxer therefore divided the space into smaller units, paying $183,351.30 in construction costs to do so.  *See* Exhibit 33.

### 2. Bronchick PC

27.   Bronchick Consulting Group, P.C. was incorporated on October 31, 1996. Exhibit 8 at 5.  On June 10, 2003, Bronchick PC became the official name of Bronchick

Consulting Group, P.C.[3]  Mr. Bronchick was the sole officer and director of Bronchick

PC.  Carolyn Bronchick, Mr. Bronchick's wife, was not an officer or employee of

Bronchick PC, and she did not have any authority to execute contracts or other legal

documents on behalf of Bronchick PC.

28.  Plaintiff was aware that Bronchick PC operated out of the Leased Premises,

as demonstrated by the marquee in the lobby, which said "Bronchick & Associates,

PC."  The name plate outside the suite that Flamingo West rented said "Bronchick &

Associates," Exhibit 22, which referred to Bronchick PC.

29.  Mr. Segal admitted during his testimony that he was aware that multiple

entities, specifically Bronchick PC, operated out of the Leased Premises.

30.  Bronchick PC retained Sheldon Gold Realty on September 11, 2012 to find

a new location to operate its business.  Mr. Bronchick testified that Bronchick PC most

likely started discussions with Sheldon Gold Realty a few weeks before entering into the

September 11, 2012 agreement.

### 3. Bronchick & Associates

31.  Bronchick & Associates occupied a portion of the Leased Premises.  Plaintiff

was aware that Bronchick & Associates operated out of the Leased Premises, as

demonstrated by the marquee on the door of the Leased Premises, which said

"Bronchick & Associates."  Exhibit 22.

32.  Bronchick & Associates is listed as a "dba" of Flamingo West in the original

lease under the definition of "Tenant," Exhibit 1 at 1, and in the signature line, *id.* at 33,

---

[3]Bronchick Consulting Group, LLC was formed on October 11, 2012.  Exhibit 10
at 3.

but is not named in the Third Amendment to the lease agreement, which was executed on March 29, 2011, Exhibit 4, p.1, or in the Fourth Amendment, which was executed on August 1, 2011.  *See* Exhibit 5.

### 4. *Flamingo West*

33.  Flamingo West was originally incorporated as a real estate investment management corporation in 1994 by Phyllis Rockower, Mr. Bronchick's mother.  There are two officers of Flamingo West – Mr. Bronchick and his sister, Eileen Bronchick.

34.  Flamingo West filed a Certificate of Assumed or Trade Name with the Colorado Secretary of State on April 5, 1999, identifying Legalwiz Publications as a trade name under which Flamingo West conducts its seminars and publishing business. Exhibit 9, p. 2.

35.  Flamingo West filed a Statement of Trade Name Withdrawal for Legalwiz Publications with the Colorado Secretary of State on September 14, 2012.  Exhibit 9, p. 3.

### a. Rent Payments

36.  For a period of time, Mr. Bronchick paid Flamingo West's rent using checks bearing the name "Denver Real Estate Club, Inc., dba Colorado Association of Real Estate Investors" ("CAREI").  Exhibit 19.  Mr. Bronchick testified that the name on the checks, "Denver Real Estate Club, Inc." was incorrect and should have said "Colorado Association of Real Estate Investors, LLC."

37.  Mr. Bronchick sometimes paid Flamingo West's rent using checks from Legalwiz Publication's checking account, on which Flamingo West is listed as a dba of

Legalwiz Publications.  Mr. Bronchick's signature appears on the Legalwiz Publications checks used to pay Flamingo West's rent.  The checks Legalwiz used to pay Flamingo West's rent appear on Legalwiz's "Profit and Loss Detail" spreadsheet for 2011.  Exhibit 74 at 173.

### b. Business Expenses

38.  Flamingo West maintained two debit cards, one for Mr. Bronchick and one for Eileen Bronchick.  Mr. Bronchick testified that Flamingo West used two American Express cards, which were not credit cards, but rather charge cards "with the name of the company on [them]."[4]  Mr. Bronchick testified that Flamingo West did not use credit cards.  He also testified that these cards were "not on Flamingo's credit but on my and my wife's personal credit," and were reimbursed by Flamingo West.  ("The charges that were charged on there were labeled on the books and paid for by Flamingo.").  Mr. Bronchick testified that Flamingo West owes him $160,902, primarily in unreimbursed credit card expenses for which he provided no receipts.

39.  Flamingo West passed a resolution authorizing the corporation to reimburse officers, directors, and employees for business expenses and travel.  Exhibit 43 at 3, 9.  Mr. Bronchick and Eileen Bronchick were the primary persons that Flamingo West reimbursed for Flamingo West expenses.  Mr. Bronchick testified to some of the business expenses reimbursed by Flamingo West: wine; a monthly Netflix subscription; a Paul Frederick shirt; a Sobakawa pillow; a .38 caliber pistol, firearm training, and a

---

[4]Mr. Bronchick's testimony on the credit cards was inconsistent, as he also testified that the American Express card "wasn't in the company's name.  It was in my wife's personal name."

14

recurring gun club membership; a corporate gift for his sister from Vera Bradley; a 30-minute seder book; NutriSystem for a Flamingo West weight-loss contest; an Ancestry.com membership; three Ticket Horse charges for event tickets for a sales contest prize; car payments on three corporate cars driven by Mr. Bronchick (a BMW), his wife (a Toyota Prius), and his brother Don Bronchick (a Volkswagen Touareg). *See* Exhibits 82-84. Except for the 30-minute seder book, Mr. Bronchick said these all were business expenses. Don Bronchick was not an employee of Flamingo West; he was employed by CAREI. Eileen Bronchick was at times employed by both Flamingo West and CAREI.

40. Flamingo West incurred legal fees from both Bronchick & Associates and Bronchick PC. Mr. Bronchick testified that no invoices exist for the professional services he provided to Flamingo West on behalf of Bronchick and Associates or on behalf of Bronchick PC.

41. Mr. Bronchick testified that Flamingo West had monthly operating expenses of about $70,000 in 2012 and $90,000 in 2011. Mr. Bronchick testified that Flamingo West had $23,249 in property management expenses in 2011.

### c. Assets and Debts

42. Flamingo West began 2011 with -$45,481 in shareholder equity; it ended 2011 with -$223,326 in shareholder equity. Flamingo West ended 2012 with -$131,681 in shareholder equity.

43. Flamingo West began 2012 with $713,193 in assets and ended 2012 with $177,223 in assets, as reflected on its federal tax return. Exhibit 48 at 5. Mr. Bronchick testified that approximately $660,000 of the assets with which Flamingo West began

15

2012 was held in real property.  Flamingo West began the 2012 tax year with $38,562 in cash.  Exhibit 48 at 5.

44.  Flamingo West was the sole owner of CAREI.  Mr. Bronchick filed Flamingo West's and CAREI's taxes on one tax return; he maintained a single ledger for Flamingo West and CAREI's income and expenses.  *See, e.g.,* Exhibit I; Exhibit H.  It is unclear which assets were held by CAREI as opposed to Flamingo West.  Mr. Bronchick testified that any asset taken off the books of CAREI would be reflected in the balance sheet of Flamingo West.  The operational and financial overlap between Flamingo West and CAREI continued until Flamingo West sold all the assets held in CAREI, and then sold CAREI.  Flamingo West's financial documents appear to show that vehicle expenses of Flamingo West and of CAREI were divided in half between the two entities, without regard to whether the vehicle was actually being used to conduct the business of both entities.  Exhibit J at 1.  Specifically, $7,147.04 in total was paid in 2011 for Don Bronchick's Touareg, Flamingo West and CAREI paying $3,573.52 each, though Don Bronchick was a sales manager for CAREI and was not an employee of Flamingo West.  *See* Exhibit J, p. 1; Exhibit 112 at 5, 10-11.

45.  The December 31, 2011 ledger for Flamingo West[5] reflects five parcels of real property generating $55,856.60 in rental income that year.  Exhibit I at 2; *see* Exhibit H at 1-3.  Those five properties are: (1) 1064 Chambers Court ("Chambers"); (2)

---

[5]The ledgers for Flamingo West are titled "Legalwiz Publications General Ledger."  *See, e.g.,* Exhibits H-K.  There was no testimony at trial regarding the labeling of Flamingo West's ledgers, but Mr. Bronchick's testimony at trial about Flamingo West's financials was based on entries on the "Legalwiz Publications General Ledger." Information regarding CAREI's financials is also contained on the "Legalwiz Publications General Ledger."  *See, e.g.,* Exhibit J at 1.

4345 E. Arapahoe ("Arapahoe"); (3) 3947 S. Truckee Street ("Truckee"); (4) 1750

Jamaica Street ("Jamaica"); and (5) 4220 S. Richfield ("Richfield").  The single ledger

maintained for Flamingo West and CAREI reflects rental income from rented properties,

but does not indicate how much rental income each property generated.  *See* Exhibit I

at 1-2.  The December 31, 2011 ledger also reflects that Flamingo West made a total of

$50,333.98 in mortgage payments on the Arapahoe, Truckee, Jamaica, and Richfield

properties.  Exhibit K at 1-2.

46.  Mr. Bronchick acquired the Arapahoe, Truckee, Jamaica, and Richfield

properties in his own name.  *See* Exhibit 63 at 7 (February 20, 2007 warranty deed

conveying Jamaica property to Mr. Bronchick); Exhibit 64 at 6 (February 17, 2006

special warranty deed conveying Truckee property to Mr. Bronchick); Exhibit 65 at 9

(February 27, 2007 warranty deed conveying Richfield property to Mr. Bronchick);

Exhibit 67 at 10 (August 26, 2005 warranty deed conveying Arapahoe property to Mr.

Bronchick).  The mortgages on the properties were taken out personally by Mr.

Bronchick.[6]  Mr. Bronchick later conveyed each property to a revocable trust specific to

that property.  *See* Exhibit 63 at 6 (November 28, 2007 warranty deed conveying

Jamaica property from Mr. Bronchick to the "1750 Jamaica Street Trust"); Exhibit 64 at

5 (November 28, 2007 warranty deed conveying Truckee property from Mr. Bronchick

to the "3947 S. Truckee Street Trust"); Exhibit 65 at 9 (November 28, 2007 warranty

deed conveying Richfield property from Mr. Bronchick to the "4220 S. Richfield Street

_____

[6]Mr. Bronchick testified that Flamingo West owed the money for the mortgage
following the transfer of the beneficial interest in the property into the trust, but that he
"was still effectively a guarantor as [the mortgage] was originally in my name."

Trust"); Exhibit 67 at 7 (November 28, 2007 warranty deed conveying Arapahoe

property from Mr. Bronchick to the "4345 E. Arapahoe Pl. Trust"). Mr. Bronchick

testified that he then, presumably as the trustee, transferred the beneficial interest in

each trust to Flamingo West. Flamingo West assumed the mortgages on the properties

when the beneficial interest in the properties was transferred to it. The transfers of

beneficial interest in the properties to Flamingo West were not recorded with the county

clerk and recorder. Flamingo West did not execute a note evidencing these transfers or

its obligation to make mortgage payments. Flamingo West presently holds one parcel

of real property, located at 1064 Chambers Court, Unit 203.[7] All remaining assets of

Flamingo West are in Mr. Bronchick's custody and control.

47. Mr. Bronchick testified that Flamingo West held $497,712 in mortgages as a

nonrecourse debt on its balance sheet. Flamingo West's balance sheet reflects the

mortgage payments it made on the properties. *See* Exhibit K at 2.

48. Mr. Bronchick testified that the trusts transferred the beneficial interests in

the Arapahoe, Truckee, Jamaica, and Richfield properties from Flamingo West to his

wife, Carolyn Bronchick. Mr. Bronchick stated that these transactions were not

recorded with the county clerk and recorder's office because they involved assigning

the beneficial interests in a trust from Flamingo West to Ms. Bronchick. Mr. Bronchick

testified that legal title to the properties in which his wife holds the beneficial interests

are held in trust. Mr. Bronchick stated that he changed the beneficial interest in the

trust from Flamingo West to his wife because his accountant advised him that, since

---

[7]Mr. Bronchick testified that there were two Chambers properties, one of which
was sold and the other of which was kept by Flamingo West.

Flamingo West was a C-corporation, there was no benefit of that taxable loss and the beneficial interest in the properties should be transferred to his wife so that she could take advantage of the depreciation and losses.  Mr. Bronchick testified that one Chambers Court property was sold to a friend.[8]

### d.  Loans

49.   Flamingo West and Mr. Bronchick frequently loaned money to each other. Mr. Bronchick testified that Flamingo West owed him $160,902, comprised primarily of unreimbursed and unpaid expenses.  These loans were not memorialized in written agreements; the total amount owed between the parties was updated and reflected on tax returns.  *See, e.g.,* Exhibit 47 at 5, Line 7 (2011 Flamingo West loan to Mr. Bronchick of $33,115[9]).

### e.  Revenue

50.   Flamingo West's total annual income declined from $960,947 in 2012, Exhibit 48 at 1, to $36,282 in 2013.[10]   Exhibit 49 at 1.  Mr. Bronchick's explanation for the decline of $920,000 in total annual income between 2012 and 2013 was the sale of CAREI on or about October 10, 2012 to Paul Pedri[11] for one hundred dollars.  *See*

---

[8]Plaintiff introduced documentary evidence showing that Flamingo West still owns the Unit 203 Chambers Court property.  *See* Exhibit 61.

[9]This tax return reflects $23,895 in shareholder loans outstanding in the beginning of 2011 and $57,010 in shareholder loans outstanding at the end of 2011. Exhibit 47 at 5, Line 7.

[10] In 2011, Flamingo West's income was $998,516.  Exhibit 47 at 1.

[11]The Agreement of Sale shows that CAREI was sold to Endeavor Properties, Inc.; Paul Pedri signed the sale agreement as "President" of Endeavor Properties, Inc. Exhibit 68 at 5.

Exhibit 68 at 1, 5.  Per Mr. Bronchick's testimony, he sold CAREI for one hundred dollars more than its fair market value.

## II.  CONCLUSIONS OF LAW

Plaintiff bears the burden of establishing by a preponderance of the evidence its breach of contract, unjust enrichment, and fraudulent transfer claims.  Colo. Rev. Stat. § 13-25-127(1) ("Any provision of the law to the contrary notwithstanding . . . the burden of proof in any civil action shall be by a preponderance of the evidence."); *see McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 72-73 (Colo. App. 2009).  Flamingo West and Bronchick & Associates must establish by a preponderance of the evidence their affirmative defenses of constructive eviction and failure to mitigate damages.  *See* Colo. Rev. Stat. § 13-25-127(1).

Pursuant to the Lease Agreement, Colorado law applies to the claims in this case.  Exhibit 1 at 28 ("The laws of the State of Colorado shall govern the validity, performance and enforcement of this Lease.").

### A.  Breach of Contract

Plaintiff's first claim is for breach of the lease agreement against Flamingo West, Mr. Bronchick, and Bronchick & Associates.  Plaintiff's second claim for relief is for breach of the lease agreement against Bronchick PC as the successor entity of Bronchick & Associates.

The elements of a breach of contract are (1) the existence of a binding agreement; (2) plaintiff's performance of its obligations or some justification for its non-performance; (3) defendant's failure to perform its obligations; and (4) damages

resulting therefrom. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.

1992).

The Court has already granted summary judgment to plaintiff against Flamingo

West as to plaintiff's first claim for breach of contract. However, two issues remain as

to the first claim: first, whether Mr. Bronchick or Bronchick & Associates breached the

lease; second, if Mr. Bronchick did not breach the lease, whether Mr. Bronchick can be

found liable for Flamingo West's breach of the lease through piercing Flamingo West's

corporate veil.[12]

---

[12]Defendants Mr. Bronchick and Bronchick & Associates raise the affirmative defense of constructive eviction to plaintiff's claim for breach of the lease agreement. Docket No. 66 at 11, ¶ 89. In Colorado, a "'disturbance of a lessee's possession by his lessor which renders the premises unfit for occupancy for the purposes for which they were leased, or which deprives the lessee of the beneficial enjoyment of the premises' constitutes a construction eviction, provided the lessee quits the premises within a reasonable time." *Copeland v. Lincoln*, 166 P.3d 245, 247 (Colo. App. 2007) (quoting *Radinsky v. Weaver*, 460 P.2d 218, 220 (Colo. 1969)). Mr. Bronchick testified that one reason he decided to vacate the Leased Premises was because the air conditioning was not adequate. However, no testimony at trial was offered to establish that Flamingo West provided notice to Boxer that the HVAC system was insufficient. Thus, Boxer was given no opportunity to cure the defect prior to Flamingo West's abandonment of the property. *See, e.g.*, *Home Rentals Corp. v. Curtis,* 236 Ill. App. 3d 994, 998 (Ill. App. Ct. 1992) ("[A] tenant may not abandon premises under the theory of constructive eviction without first affording the lessor a reasonable opportunity to correct the defects in the property.") (citation omitted); *Pague v. Petroleum Prods., Inc.*, 461 P.2d 317, 319 (Wash. 1969) ("In order for a vacating tenant to claim constructive eviction, it is essential that he give the landlord notice of the act or condition complained of and an opportunity to remove or correct the condition.") (citation omitted); *see also* Restatement (Second) of Prop.: Landlord & Tenant § 5.4 (1977) (stating that a landlord breaches his obligations if his "failure to fulfill an obligation to repair . . . makes the leased property unsuitable for the use contemplated by the parties and the landlord does not correct the situation within a reasonable time after being requested by the tenant to do so"). Moreover, defendants did not pursue their theory of constructive eviction during closing argument. The Court finds that defendants have failed to establish that Flamingo West was constructively evicted from the Leased Premises.

### 1. Whether Mr. Bronchick or Bronchick & Associates were parties to the lease

The Court first addresses the issue of which entities signed the lease.  If Mr. Bronchick and Bronchick & Associates were not parties to the lease, they cannot be said to have breached the contract.

The first page of the 2003 Lease lists "FLAMINGO WEST LIMITED CORP. dba Legalwiz Publications and Bronchick & Associates" as the "Tenant."  Ex. 1 at 1. "FLAMINGO WEST LIMITED CORP" appears on the first line in bold capital letters, and "dba Legalwiz Publications and Bronchick & Associates" appears in bold on the second line. *Id*.  Thus, Flamingo West is the first listed entity in a more distinct typeset than Legalwiz Publications and Bronchick & Associates.  Moreover, the use of the term "Tenant," as opposed to "Tenants," throughout the lease implies that only one entity was a tenant under the lease agreement.  On the signature page, "Flamingo West Limited Corp." is named in bold capital letters under "Tenant."  Below Flamingo West Limited Corp., in smaller, standard font, states "a Colorado corporation" and on the following line in the same typeset states "dba Legalwiz Publications and Bronchick & Associates."  Exhibit 1 at 33.  Legalwiz Publications was a trade name of Flamingo West and was not a distinct entity.  *See* Exhibit 9 at 1-2.  Given the distinct typeset used to set off Flamingo West from Legalwiz Publications and Bronchick & Associates, and the evidence that Legalwiz Publications was only a trade name of Flamingo West and thus was not a distinct entity on the lease, the Court finds that plaintiff has failed to establish by a preponderance of the evidence that Bronchick & Associates was a party to the 2003 lease agreement.

Mr. Bronchick signed the 2003 lease as "Pres."  Mr. Bronchick testified that his signature was as president of Flamingo West and that he did not intend to sign the lease personally.  Plaintiff has not provided any evidence or testimony that Mr. Bronchick signed the lease in a personal capacity.  The Court finds that Mr. Bronchick was not a party to the 2003 lease agreement.

The First and Second Amendments to the 2003 lease agreement list "FLAMINGO WEST LIMITED CORP. d/b/a Legalwiz Publications and Bronchick & Associates" as the tenant on the signature page.  Exhibit 2 at 6; Exhibit 3 at 5.  Mr. Bronchick signed these amendments as "President."  The Third Amendment lists "Flamingo West Limited Corp." as the tenant; it does not mention Bronchick & Associates and is signed by Mr. Bronchick as "Pres."  Exhibit 4 at 1-3.  For the same reasons that Bronchick & Associates and Mr. Bronchick were not parties to the original 2003 lease, they are not parties to the First, Second, or Third Amendments to the lease.

Bronchick & Associates is not listed on the Fourth Amendment – the only lease sued upon – and Mr. Bronchick did not sign the Fourth Amendment.  Rather, the Fourth Amendment lists as Tenant "Flamingo West LTD" and is signed by Eileen Bronchick as Flamingo West's Chief Operating Officer.  Exhibit 5 at 3.

There is no basis to infer that Mr. Bronchick or Bronchick & Associates were tenants under the lease since they were not signatories to any previous lease.  Thus, plaintiff fails to carry its burden of showing that Mr. Bronchick or Bronchick & Associates was a signator to the lease or any of its amendments.

Plaintiff's second claim for relief is against Bronchick PC as the successor entity of Bronchick & Associates.  Pursuant to the magistrate judge's sanctions order, the Court found that Bronchick P.C. assumed all liabilities of Bronchick & Associates.  Docket No. 130 at 9; *see* Docket No. 65 at 13, ¶ 62c.  Plaintiff argues that Bronchick PC, as Bronchick & Associates' successor entity, should be liable for Bronchick & Associates' breach of the lease.  However, Bronchick PC cannot be liable for a breach of the lease agreement because, as discussed above, Bronchick & Associates was not a party to, and did not breach, the lease agreement.

### 2.  Corporate Veil Piercing

Even though Mr. Bronchick was not a signatory to the lease in his personal capacity and therefore is not directly liable for breach of the lease, plaintiff alleges in its first claim that Mr. Bronchick is personally liable for Flamingo West's breach of the lease because Flamingo West is the alter ego of Mr. Bronchick.  Docket No. 65 at 11.  Under Colorado law, before piercing a corporation's veil of limited liability, the Court must make a three-part inquiry.  *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006).  All three prongs of the analysis must be satisfied.  *Id.*  The paramount goal of piercing the corporate veil is to achieve an equitable result.  *Id.*; *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1004 (Colo. 1998); *Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC*, 37 P.3d 485, 490 (Colo. App. 2001).

First, the Court must determine whether the corporate entity is the "alter ego" of the person or entity in issue.  *Id.*  Under Colorado law, "[a]n alter ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders'

24

own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.'" *In re Phillips*, 139 P.3d at 644 (quoting *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004)). To determine alter ego status, courts consider whether (1) the corporation is operated as a distinct business entity; (2) funds and assets have been commingled; (3) adequate corporate records are maintained; (4) the nature and form of the entity's ownership and control facilitate misuse by an insider; (5) the business is thinly capitalized; (6) the corporation is used as a "mere shell"; (7) legal formalities are disregarded; and (8) corporate funds or assets are used for noncorporate purposes. *Id.* (citing *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003)). This inquiry looks to the specific facts of each case; not all of the listed factors need to be shown in order to establish alter ego status. *See Great Neck*, 37 P.3d at 490.

The second prong of the veil piercing inquiry looks to whether justice requires recognizing the substance of the relationship over the form of the relationship because the corporate fiction was "used to perpetrate a fraud or defeat a rightful claim." *Phillips*, 139 P.3d at 644; *Reader v. Dertina & Assocs. Mktg., Inc.*, 693 P.2d 398, 399 (Colo. App. 1984) (veil piercing applies "where the corporate entity has been used to defeat public convenience, or to justify or protect wrong, fraud, or crime, or in other similar situations where equity requires").

The final prong of the veil piercing inquiry considers "whether an equitable result will be achieved by disregarding the corporate form and holding the shareholder personally liable for the acts of the business entity." *Phillips*, 139 P.3d at 644 (citing

*Water, Waste & Land, Inc.*, 955 P.2d at 1004); *see also Great Neck*, 37 P.3d at 490

("Piercing the corporate veil is an equitable remedy, requiring balancing of the equities

in each particular case.").  "A claimant seeking to pierce the corporate veil must make a

clear and convincing showing that each consideration has been met." *Phillips*, 139

P.3d at 644.

Plaintiff asks the Court to pierce the corporate veil of Flamingo West and impose

liability for the debts of Flamingo West on its sole shareholder and operator, Mr.

Bronchick.

### a.  Whether Flamingo West is the Alter Ego of Mr. Bronchick

The Court considers the following alter ego factors from *Phillips*:

### i.  Whether the corporation is operated as a distinct business entity

The magistrate judge's sanctions order established that Flamingo West is not

operated as a separate and distinct business entity; that Mr. Bronchick is the sole

owner, operator, officer, and shareholder of Flamingo West and is the only person who

operates the business of Flamingo West; that Mr. Bronchick has sole decision making

authority for Flamingo West; and that Mr. Bronchick received payments from Flamingo

West even when Flamingo West was unable to meet its outstanding financial

obligations.  Docket No. 65 at 11, ¶ 55a-c, e.  These findings are conclusive and weigh

in support of disregarding Flamingo West's corporate form.

### ii.  Whether funds and assets were commingled

Flamingo West and Mr. Bronchick frequently loaned money to each other, but

these loans were not documented in any manner.  The total amount owed between the

parties was, however, reflected on tax returns.  *See, e.g.,* Exhibit 47 at 5, line 7.  Mr. Bronchick testified that he and his wife accumulated $160,902 in credit card charges on behalf of Flamingo West, but that they were not reimbursed by Flamingo West.  Mr. Bronchick maintains that Flamingo West still owes him $160,902, but he admits that there is no promissory note memorializing that debt and admits that he has not produced credit card receipts for these charges.

The Court finds that plaintiff has presented clear and convincing evidence of Mr. Bronchick and Flamingo West commingling assets.

### iii. Whether adequate corporate records were maintained

The magistrate judge's sanctions order established that adequate corporate records for Flamingo West were not maintained.  This finding is conclusive and supports disregarding Flamingo West's corporate form.

In addition, plaintiff introduced evidence supporting this finding at trial. Specifically, Mr. Bronchick admitted that no records or promissory notes evidenced Flamingo West's obligation to pay the mortgages for the five properties to which it held the beneficial interests in trusts.

The Court finds that Mr. Bronchick did not maintain adequate records for Flamingo West.

### iv. Whether the nature and form of the entity's ownership and control facilitate misuse by an insider

The magistrate judge's sanction order established that Mr. Bronchick is the sole owner, operator, officer, and shareholder of Flamingo West, and that Mr. Bronchick, as

the only person who operates the business of Flamingo West, has sole decision making authority for Flamingo West.

Defendants concede that Mr. Bronchick's status as the sole director and shareholder of Flamingo West would theoretically facilitate misuse by an insider. Docket No. 164 at 3. The Court finds that Mr. Bronchick's sole ownership and control of Flamingo West did facilitate misuse of the corporate form.

### v.  Whether the business is thinly capitalized

The magistrate judge's order established that Mr. Bronchick did not maintain sufficient money in Flamingo West's bank account to cover the costs of Flamingo West's financial obligations under the lease agreement, that in or about April 2012 Flamingo West became insolvent and otherwise unable to pay liabilities as they came due, and that the assets of Flamingo West that remained after its fraudulent transfers[13] were insufficient for Flamingo West to pay its outstanding financial liabilities. This finding is conclusive. Moreover, Mr. Bronchick admitted in his testimony that there was not adequate cash to run the business and pay its bills in 2012. The Court finds that Flamingo West was thinly capitalized in 2012 and 2013.

### vi.  Whether the corporation is used as a "mere shell"

Plaintiff admits that Flamingo West was not formed in 1994 as a shell. Rather, plaintiff's theory is that, beginning in 2012, Mr. Bronchick drained Flamingo West of its

---

[13]The magistrate judge's order, and the allegations in the second amended complaint which the magistrate judge's order entered as findings of fact, do not specify which transfers were fraudulent or which transfers rendered Flamingo West unable to pay its outstanding liabilities. *See* Docket No. 130; Docket No. 65.

assets to frustrate plaintiff's rent collection efforts and thereby turned Flamingo West into a shell.

For many years, Flamingo West had more than $1 million in annual revenue. *See, e.g.,* Exhibit 45 at 1 (2008 tax return reflecting $2,194,658 in total income); Exhibit 46 at 1 (2009 tax return reflecting $1,396,858 total income). In 2011, Flamingo West earned $998,516 in income. Exhibit 47, line 11. As late as March 2011, Flamingo West decided to lease more space at Pavilion Tower and thereby to double its rent obligation. As a result, its rent increased from $5,430.38 to $10,546.00 per month. Exhibit 4 at 1. At that time, Flamingo West beneficially owned at least five parcels of real estate. Exhibit H at 1-2.

By April 2012, however, Flamingo West was insolvent. When Flamingo West abandoned the Leased Premises in November 2012, it had almost no assets or business operations from which it could generate revenue. On October 10, 2012, a few weeks before Flamingo West abandoned the premises, Flamingo West sold CAREI for $100 to Mr. Pedri. Exhibit 68 at 1. Mr. Bronchick testified that all of the real property in which Flamingo West held a beneficial interest was sold in either late 2011 or early 2012. Mr. Bronchick stated that the Chambers Court property was sold to a woman he knew and that the other four properties – Richfield, Truckee, Jamaica and Arapahoe – were sold to his wife. The sales to Mr. Bronchick's wife were achieved by changing the beneficiary of the trust in which the properties were held from Flamingo West to Ms. Bronchick. Sale of the Richfield property is reflected on a December 1, 2012 warranty deed from the 4220 S. Richfield Street Trust to Equity Holding Corp.; the sale price was

$10.  Exhibit 65 at 5.  There is no evidence indicating the price for which the Truckee,
Jamaica, Chambers, or Arapahoe properties were sold between 2011 and 2012.

Mr. Bronchick attributes Flamingo West's insolvency to several bad years in the
real estate business.  Mr. Bronchick testified that CAREI was losing hundreds of
thousands of dollars a year.  Mr. Bronchick also testified that the reason Flamingo West
sold the real properties was because they were losing money and that, at the
recommendation of his accountant, Flamingo West sold the properties to Ms. Bronchick
so that they could take advantage of the depreciation and losses on the properties.

Plaintiff has not provided evidence to rebut Mr. Bronchick's contention that
Flamingo West's business was failing and that CAREI was losing money; plaintiff has
also not provided evidence of the value at the time of the sales of the real property
Flamingo West sold to Ms. Bronchick between 2011 and 2012.  While the Court finds
the timing of Flamingo West's asset sales suspicious, the sales themselves can be
explained as the liquidation of a failing business.

However, while the real estate market may have caused losses to Flamingo
West, plaintiff has proved by clear and convincing evidence that Mr. Bronchick began
treating Flamingo West like a shell corporation in 2011 and 2012.  Mr. Bronchick did not
maintain enough money in Flamingo West's bank account to pay Flamingo West's rent,
and he caused Flamingo West to make fraudulent transfers to himself for which
Flamingo West did not receive reasonably equivalent value in exchange.  The Court
finds that, once Flamingo West began experiencing losses in 2011 and 2012, Mr.
Bronchick began treating Flamingo West as a mere shell to an extent that surpassed
his disregard of corporate formalities in the past.  The Court therefore finds that plaintiff

has clearly and convincingly shown that Mr. Bronchick operated Flamingo West as a mere shell.

### vii.  <u>Whether legal formalities were disregarded</u>

Flamingo West has not held an annual meeting since 2007.  Exhibit 43, p. 58. The loans between Mr. Bronchick and Flamingo West were not documented or secured with notes.  Debts to Mr. Bronchick and his wife for expenses charged on their American Express cards were not reimbursed and not recorded on Flamingo West's books.  As a result, the Court finds that Mr. Bronchick ignored legal formalities regarding Flamingo West.

### viii.  <u>Whether corporate funds or assets were used for noncorporate purposes</u>

Regarding Mr. Bronchick's testimony concerning business expenses, while few of the expenditures to which Mr. Bronchick testified are categorically excluded from classification as business expenses, any given page of Flamingo West's list of business expenses consists almost entirely of items that appear more personal than business related.  *See generally* Exhibit 82 at 468-71 (Section 3050 - Distributions).  For instance, Exhibit 82, p. 469 is a list of business expenses between April 20, 2011 and August 22, 2011.  Of the 49 listed entries, twenty are for Amazon Video on Demand, seven are for Amazon.com or Amazon Marketplace, four are for Netflix, three are for iTunes Music Store, four are for NutriSystem, five appear to be for clothing, one is for Sam Ash Music, one is for American Musical, one is for Classmates.com, one is for Weis Supermarkets, and two are for Cheaper Than Dirt, a firearm supply retailer. Similarly, for the time period between August 23, 2011 and December 17, 2011, *see id*.

at 470, almost all entries are for items that do not appear to be typical business expenses, such as Sea Eagle Boats, Sailboatowners.com, West Marine, Ancestry.com, and Paul Frederick Shirts.  In 2011, these expenses totaled approximately $5,000.  *See id*. at 471 ($6,329.82 in debits and $1,142.93 in credits).

As discussed earlier, the financial statements of Flamingo West and Mr. Bronchick's testimony make clear that Flamingo West paid for Don Bronchick's vehicle, even though Don Bronchick was not an employee.

Although Mr. Bronchick testified that most of these were business expenses, given that nearly all of the questioned business expenses are for items which appear personal, the Court finds that Mr. Bronchick is not credible and finds that plaintiff has clearly and convincingly proved that Mr. Bronchick used corporate funds for personal expenses.  Since the amount of funds used for noncorporate purposes is only a small percentage of Flamingo West's total expenses, the Court finds that these facts only slightly weigh in favor of piercing the corporate veil.

### ix. <u>Conclusion</u>

Plaintiff has shown by clear and convincing evidence that all eight alter ego factors weigh in favor of finding Flamingo West to be the alter ego of William Bronchick. However, to pierce the corporate veil and impose liability on Mr. Bronchick, the Court must determine that Mr. Bronchick used Flamingo West's corporate form – and its veil of limited liability – to perpetrate a wrong against plaintiff.

### b.  Whether the corporate form was used to perpetrate a wrong

Only when the corporate form is used to shield a dominant shareholder's improprieties may the veil be pierced.  *Phillips*, 139 P.3d at 641.  As noted earlier, Flamingo West was not created for purposes of being a shell corporation.  However, in 2012, Mr. Bronchick turned Flamingo West into a shell that was not operated as a distinct business entity.  He was the only one who operated Flamingo West and did not maintain enough money in Flamingo West's bank account to pay Flamingo West's rent.  Moreover, during the time when Flamingo West was not paying rent, Mr. Bronchick caused Flamingo West to make payments to him.  Mr. Bronchick caused Flamingo West to make fraudulent transfers to him for which Flamingo West did not receive reasonably equivalent value in exchange.  What assets of Flamingo West that remained after such transfers were insufficient for Flamingo West to pay its outstanding financial liabilities, including its debts to plaintiff.  Mr. Bronchick had the intent to hinder, delay, or defraud creditors of Flamingo West, including Boxer, when he caused Flamingo West to make these transfers.  These findings lead the Court to conclude that Mr. Bronchick used the corporate form to perpetrate a wrong against plaintiff.

### c.  Equitable result from piercing the veil of limited liability

Veil piercing is appropriate only if it will generate an equitable result.  *Phillips*, 139 P.3d at 644.  Flamingo West's remaining assets are the Chambers Court property, outdated computer equipment, and office furniture kept in the basement of the location at which Mr. Bronchick currently does business.  These assets are insufficient to compensate plaintiff for the damages plaintiff has incurred from Flamingo West's breach of the lease agreement.

33

Plaintiff has clearly and convincingly established that Flamingo West is an alter ego of Mr. Bronchick, with all eight alter ego factors weighing in plaintiff's favor.  Plaintiff has also clearly and convincingly shown that Mr. Bronchick used the corporate form of Flamingo West, a company he controlled, to transfer its assets to himself without Flamingo West receiving appropriate compensation, leaving Flamingo West unable to pay its financial obligations to plaintiff.  Allowing plaintiff to recover the rent owed by Flamingo West directly from Mr. Bronchick will achieve the equitable result of compensating plaintiff for its losses under the lease agreement.  The Court therefore pierces the corporate veil of Flamingo West and finds Mr. Bronchick liable to plaintiff under plaintiff's first claim for relief for Flamingo West's breach of the lease agreement.

### B.  Unjust Enrichment

In its third claim for relief, plaintiff argues, as an alternative theory of liability, that if Bronchick PC is not a party to the lease, then Bronchick PC was unjustly enriched because it did not pay rent while accepting the benefits of leased space during the time that Flamingo West was not paying rent.  The elements of an unjust enrichment claim are: (1) plaintiff conferred a benefit on the defendant; (2) defendant accepted the benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without compensating plaintiff.  *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1260 (D. Colo. 2014) (citing *Dass v. Epplen*, 424 P.2d 779, 780 (Colo. 1967)).

The use and possession of real property can constitute a "benefit" for purposes of an unjust enrichment claim.  *See Martinez v. Cont'l Enterprises*, 730 P.2d 308, 317

34

(Colo. 1986) ("[R]espondents obtained and appreciated a benefit from possession of the property by using it for storage space and intermittently allowing certain persons to occupy the house."). However, "[i]n general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Bedard v. Martin*, 100 P.3d 584, 592 (Colo. App. 2004) (citing *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003)); *Printz Servs. Corp. v. Main Elec., Ltd.,* 949 P.2d 77 (Colo. App. 1997), *aff'd in part and rev'd in part*, 980 P.2d 522 (Colo. 1999). During the term of a lease, a tenant is normally entitled to full possession of the premises, even to the exclusion of his landlord. *Rutherford v. Scarborough*, 472 P. 2d 721, 723 (Colo. App. 1970). Unless specifically reserved by the terms of the lease, all benefits normally derived from use of land are granted to the lessee. *Id.* Flamingo West was the only tenant on the 2003 Lease and its subsequent amendments, and there was no contractual relationship between plaintiff and Bronchick PC.

Plaintiff cites no case in which a landlord successfully asserted an unjust enrichment theory of liability against a subtenant for its occupation of premises leased by a tenant. Plaintiff had an enforceable lease against Flamingo West. Plaintiff knew that Bronchick PC occupied space in the leased premises. In fact, Boxer added Bronchick PC's name to the marquee in the building lobby. It had remedies against unapproved subtenants, *see* Exhibit 1-1 at 19, but chose not to exercise them. Plaintiff fails to prove that it would be inequitable for defendant Bronchick PC to retain the

benefit of its occupancy in the leased space without separately paying rent to plaintiff. As a result, its third claim fails.

### C. **Fraudulent Transfers**

Plaintiff's fourth claim is against Mr. Bronchick and Flamingo West for making fraudulent transfers under CUFTA, Colo. Rev. Stat. § 38-8-105. CUFTA "provides in summary that a debtor's transfer of assets is fraudulent if it was made [1] with the intent to hinder, delay or defraud a creditor or [2] [(a)] without receiving equivalent value in return" and (b) under circumstances in which it was reasonably unlikely that the debtor's remaining assets would be sufficient to satisfy the debtor's outstanding debts. *See Kirzhner v. Silverstein*, 870 F. Supp. 2d 1145, 1161 (D. Colo. 2012); *CB Richard Ellis, Inc v. CLGP, LLC*, 251 P.3d 523, 529-30 (Colo. App. 2010) (discussing CUFTA's "constructive fraud" provision provided in Colo. Rev. Stat. § 38-8-105(1)(b)(I) and (II)); *see also In re Grandote Country Club Company, Ltd.*, 252 F.3d 1146, 1151 (10th Cir. 2001) ("To run afoul of CUFTA, a transfer must involve 'actual intent to hinder, delay, or defraud any creditor' or must have been made for less than 'reasonably equivalent value.'").

The magistrate judge's sanction order established that Flamingo West made fraudulent transfers to Mr. Bronchick; Flamingo West made said transfers with the actual intent to hinder, delay, or defraud its creditors, including Boxer; Flamingo West owes a substantial debt to Boxer. *See* Docket No. 130 at 9, ¶ 3.c; Docket No. 65, ¶¶ 79-80. Moreover, the sanctions order established that "Mr. Bronchick is the sole owner, operator, officer and shareholder of Flamingo West," he is "the only person who

operates the business of Flamingo West," and "has sole decision making authority for Flamingo West."  Docket No. 65 at 11, ¶ 55a-c.  Accordingly, Flamingo West and Mr. Bronchick are liable to the plaintiff for the value of the assets transferred in Flamingo West's attempt to defraud plaintiff of lease payments.

As noted in the court's October 23, 2015 order, to prove its fraudulent transfer claim at trial, plaintiff was required "to identify and prove the transfers that took place between Flamingo West and Mr. Bronchick during the time period at issue."  Docket No. 185 at 14.  Plaintiff's fraudulent transfer claim is based on Flamingo West's real estate transfers; plaintiff did not identify any other transfers as fraudulent.

The Court has already noted that the timing of Flamingo West's transfer of the beneficial interest in the Truckee, Richfield, Arapahoe, and Jamaica properties between 2011 and 2012 to Mr. Bronchick's wife, which were within a year of when Flamingo West became insolvent, are suspect.  Although Mr. Bronchick tried to explain the transfers of the beneficial interest from these properties as being motivated by certain tax consequences, transfers between family members are closely scrutinized.  *See Edwards v. Litch*, 262 P. 1016, 1017 (Colo. 1927) ("[T]ransfers, when between husband and wife, or between members of a family, are closely scrutinized.") (citation omitted).

Plaintiff has the burden of proving that, at the time they were made, these transfers involved assets that plaintiff otherwise could have tried to collect upon. Plaintiff, however, did not introduce any evidence of the value of the Truckee, Richfield, Arapahoe, or Jamaica properties in 2011 and 2012.  Plaintiff also failed to introduce a comparison of the fair market value of each of the properties in 2011 and 2012 to the expenses that Flamingo West was incurring on the properties to analyze whether the

37

nominal price that Mrs. Bronchick paid for the properties was a reasonably equivalent value.  And plaintiff failed to provide comparative evidence regarding the Chambers Court property that Mr. Bronchick sold.  In light of plaintiff's failure to present such evidence regarding the sale of the Chambers Court property and the transfer of the beneficial interests in the other properties, and therefore the lack of evidence as to whether Flamingo West received a reasonably equivalent value in exchange for those transfers, plaintiff has not carried its burden of proving the CUFTA claim against Mr. Bronchick and Flamingo West.

### D. Damages

#### 1. Breach of Contract Damages

Flamingo West did not respond to plaintiff's summary judgment motion or contest plaintiff's damages calculations, so the Court accepted the analysis and adopted the damages figure proffered by plaintiff's expert, Mr. Robert Aucone, against Flamingo West in its October 23, 2015 summary judgment order.  However, Mr. Bronchick reserved the right to dispute the amount of damages for breach of the lease. Docket No. 105 at 1, n.1.  Specifically, Mr. Bronchick argues that plaintiff's damages calculations improperly compound interest and penalties on all past due amounts, and thus are contrary to the provisions in the lease agreement.[14]

---

[14]Defendants raise the affirmative defense of failure to mitigate damages. Specifically, defendants allege that Boxer "failed to diligently re-let the leased premises in a timely or reasonable fashion, and thus failed to perform their [sic] duty to mitigate damages."  Docket No. 66 at 12, ¶ 92.  "Generally, a landlord facing a breach by a tenant is required to exercise reasonable efforts to procure a substitute tenant in order to fulfill the duty to mitigate damages."  *Pomeranz v. McDonald's Corp.*, 821 P.2d 843, 847 (Colo. App. 1991), *aff'd in part, rev'd in part on other grounds*, 843 P.2d 1378 (Colo. 1993) (citing *Schneiker v. Gordon*, 732 P.2d 603 (Colo. 1987)).  Mr. Segal

Under Colorado law, interpretation of a written contract is a question of law for the court.[15]   *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo. 1984).  The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties.  *Copper Mountain Inc. v. Industrial Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009).  Contract language must be examined and construed consistently with the plain and generally accepted meaning of the words employed.  *Id*; *see Pepcol Mfg. Co.*, 687 P.2d at 1313-14 ("In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning.").  "The court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless."  *Copper Mountain, Inc.*, 208 P.3d at 697 (internal quotation marks omitted).  Last, "[i]t is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence."  *Pepcol Mfg. Co.*, 687 P.2d at 1314.

Section 2.4 of the 2003 Lease Agreement provides, in pertinent part:

> Tenant agrees to pay *all rent and other sums of money* . . . as shall become due from and payable by Tenant to Landlord under this Lease (*collectively, the "Rent"*) . . . . *All rent in addition to Base Rent shall*

---

testified regarding Boxer's construction costs to renovate the Leased Premises so that it could be leased to new tenants.  *See* Exhibits 33-34.  Defendants introduced no evidence countering Mr. Segal's testimony or tending to show that plaintiff's efforts to mitigate its damages from Flamingo West's breach of the lease were not reasonable or necessary.  Accordingly, the Court finds that defendants have not established by a preponderance of the evidence that plaintiff failed to mitigate its damages due to Flamingo West's breach of the lease.

[15]Pursuant to the Lease Agreement, "[t]he laws of the State of Colorado shall govern the validity, performance and enforcement of this Lease."  Exhibit 1 at 28.

*constitute additional rental* under this Lease and Landlord shall be entitled to exercise the same rights and remedies provided for in this Lease for nonpayment of any Rent.

Exhibit 1 at 5 (emphasis added).  Section 1.7 of the 2003 Lease Agreement, "BASE

RENT," provides that the

Tenant shall pay, in accordance with the terms and provisions of <u>Section 2.2</u> of this Lease, Base Rent for the lease and any use of the Leased Premises at the annual rental rate per rentable square foot of space in the Leased Premises for the specified time periods set forth below:

|  | Annual Rental Rate Per |  |
| --- | --- | --- |
| <u>Time Period</u> | <u>Rentable Square Foot</u> | <u>Available Monthly Rent</u> |
| Months 1-14 | $14.00 | $3,606.17 |
| Months 15-26 | $14.50 | $3,734.96 |
| Months 27-38 | $15.00 | $3,863.75 |
| Months 39-50 | $15.50 | $3,992.54 |

*Id*. at 2.  Section 2.5 of the 2003 Lease Agreement provides for the assessment of two

sums other than "Base Rent" – a 10% late penalty and 18% interest on past-due

amounts – and reads in pertinent part:

[I]f any regular monthly installment of *Rent* is not received by Landlord on or before the fifth (5th) day of the month for which such *Rent is due, a late payment charge of ten percent (10%) of such past due amount* shall become due and payable *in addition to any other amounts due and payable*.  In addition, *all Rent* owed by Tenant to Landlord under this Lease shall bear interest from the date due until the date received at a rate . . . equal to the lesser of the highest rate allowable under applicable law or eighteen percent (18%) per annum.[16]

*Id*. at 5 (emphasis added).

Though "Rent" includes other amounts due, the first sentence of Section 2.5

identifies "regular monthly installments" not received by the fifth of the month as the

---

[16]  Applicable law allows parties to contract for up to a forty-five percent interest rate.  Colo. Rev. Stat. § 5-12-103(1).  Eighteen percent is the lesser rate and thus the proper rate to be applied to the 2003 Lease.

sum on which the 10% penalty is to be assessed.  The plain and generally accepted meaning of "regular" is the monthly rent charge, not the monthly rent charge plus an unspecified variable penalty amount.  There is nothing in Section 2.5 providing for a 10% penalty on an amount other than the regular monthly installment.  Accordingly, the Court finds that the 10% penalty may not effectively be compounded by assessing the penalty on all amounts outstanding or by assessing a 10% penalty on an unpaid penalty.[17]

Regarding interest due on unpaid "Rent," the interest is assessed on "all Rent owed by Tenant to Landlord under this Lease."  Exhibit 1 at 5.  In Section 2.4, "Rent" is defined as "all rent and other sums of money . . . as shall become due from and payable by Tenant to Landlord under this Lease."  Pursuant to Section 2.5, interest is assessed on all "Rent" from the date due until the date it is received, and it includes all other sums of money in addition to monthly rent.  Accordingly, the Court finds that the 18% interest rate may be charged on "all rent and other sums of money," which includes all amounts due to plaintiff under the lease, e.g., rent, repair costs, penalties, and interest, from the date due until the date it is received by the landlord.  *See Tarabino Real Estate Co. v. Tarabino*, 126 P.2d 859, 862 (Colo. 1942) (noting that compound interest is permitted "when definitely agreed upon") (citing *Denver B. & M. Co. v. McAllister*, 6 Colo. 261 (Colo. 1882)); *see generally Francis ex rel. Goodridge v. Dahl*, 107 P.3d 1171, 1176 (Colo. App. 2005) ("Compound interest is defined as

---

[17]Plaintiff applied the 10% monthly late fee "on all amounts outstanding," including past penalties.

'interest paid on both the principal and the previously accumulated interest.'") (citing

*Black's Law Dictionary* 830 (8th rev. ed. 2004)).

Mr. Aucone's testimony regarding plaintiff's damages due to Flamingo West's breach of the lease agreement was not based on the Court's interpretation of the lease agreement.  Thus, his damages calculation of $2,428,625.03 is not the proper measure of Boxer's recovery for Mr. Bronchick's breach of the lease.  So that the Court may better determine Boxer's damages from Flamingo West's breach, the parties will be ordered to submit their calculation of damages based on the Court's interpretation of the lease agreement.  The 10% late fee may only be assessed on one month's installment of "Rent."  The parties' damages calculation should also subtract the damages mitigated by Boxer's leasing of parts of the premises based on the new tenants' rent payments and should include Boxer's repair and construction costs that it incurred in order to secure new tenants to mitigate its damages.  The parties shall explain how they performed their calculations.

## III.  CONCLUSION

It is therefore

**ORDERED** that plaintiff shall submit its proposed calculation of damages due to Boxer as a result of Mr. Bronchick's breach of the lease agreement on or before June 25, 2016 and Mr. Bronchick shall submit his proposed damages calculation on or before July 6, 2016.

DATED June 17, 2016.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge